FILED

2022 Mar-23  PM 03:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| COURTNEY LASHAY BROOKS BECKWITH, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   5:20-cv-01696-HNJ |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, COMMISSIONER, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

Plaintiff Courtney Beckwith seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability, disability insurance, and supplemental security income benefits.  The undersigned carefully considered the record, and for the reasons expressed herein, the court **REVERSES** the Commissioner's decision and **REMANDS** for further consideration of the consultative medical examiner's report in light of Beckwith's March 21, 2019, x-ray results.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.

Security Act and the Regulations promulgated thereunder. The Regulations define disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at §§ 404.1520(c), 416.920(c).

2

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00–114.02. *Id.* at §§ 404.1520(d), 416.920(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant's impairment or combination of impairments does

3

not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled.  *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work.  20 C.F.R. §§ 404.1512(b)(3), 416.912(b)(3), 404.1520(g), 416.920(g).  If the claimant can perform other work, the evaluator will not find the claimant disabled.  *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g).  If the claimant cannot perform other work, the evaluator will find the claimant disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"  *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).  The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not

4

decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Ms. Beckwith, age 29 at the time of the ALJ hearing, protectively filed applications for a period of disability, disability insurance, and supplemental income security benefits on November 29, 2018, alleging disability beginning November 15, 2017. (Tr. 52, 255-64). The Commissioner denied Beckwith's claims, and Beckwith timely filed a request for a hearing on April 15, 2019. (Tr. 166-77, 186-90). An Administrative Law Judge ("ALJ") held a hearing on November 20, 2019. (Tr. 44-115). During the hearing, Beckwith amended her alleged onset date to November 15, 2018. (Tr. 98). The ALJ issued an opinion denying Beckwith's claim on February 12, 2020. (Tr. 12-37).

Applying the five-step sequential process, the ALJ found at step one that Beckwith had not engaged in substantial gainful activity since November 15, 2018. (Tr.

5

18).   At step two, the ALJ found Beckwith had the severe impairments of spine disorders, essential hypertension, depressive disorder, bipolar disorder, anxiety disorder, and post repair fracture of bones.   (*Id.*).   At step three, the ALJ found Beckwith's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (*Id.*).   Next, the ALJ found that, despite her impairments, Beckwith exhibited the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> The claimant can occasionally lift and/or carry, including upward pulling of twenty pounds, and frequently lift and or carry, including upward pulling of ten pounds.   The claimant can sit for six hours in an eight-hour workday with normal breaks, and can stand and/or walk with normal breaks for six hours in an eight-hour workday.   The claimant's ability to push and/or pull, including operation of hand or foot controls is unlimited up to the lift and carry restriction of twenty and ten pounds. The claimant can frequently climb ramps and stairs, balance, sto[o]p, kneel, crouch, and crawl.   The claimant should not work on ladders, ropes or scaffolds, work at unprotected heights or around dangerous machinery.   The claimant can understand and carry out short simple instructions, and concentrate and remain on tasks for two-hour periods, across an eight-hour workday, five-day workweek with all customary work breaks.   Any changes in the work environment should be infrequent. The claimant can have occasional contact with the general-public, coworkers, and supervisors.

(Tr. 24).   At step four, the ALJ determined that Beckwith could not perform her past relevant work as a teller.   (Tr. 35).   However, at step five, the ALJ determined that,

considering Beckwith's age, education, work experience, and RFC, she could perform a significant number of other jobs in the national economy, such as laundry folder, parts assembler, and electronics worker. (Tr. 36-37). Accordingly, the ALJ found that Beckwith did not suffer a disability, as defined by the Social Security Act, since November 15, 2018. (Tr. 37).

Beckwith timely requested review of the ALJ's decision. (Tr. 249-52). On September 15, 2020, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision. (Tr. 1-6). On October 29, 2020, Beckwith filed her complaint with the court seeking review of the ALJ's decision. (Doc. 1).

## ANALYSIS

In this appeal, Beckwith argues the ALJ improperly considered the opinions of the consultative examiners and improperly failed to characterize her migraine headaches as a severe impairment. For the reasons discussed below, the undersigned concludes the ALJ properly considered Beckwith's migraine headaches and the consultative psychological examiner's opinion, but he did not properly consider the consultative medical examiner's opinion. Consequently, the case warrants remand to the Commissioner for further consideration of the consultative medical examiner's opinion in light of Beckwith's March 21, 2019, x-ray results.

7

**I.    The ALJ Did Not Err By Failing To Consider Beckwith's Migraines As A Severe Impairment, And He Properly Considered The Migraines In Determining Beckwith's Residual Functional Capacity**

As discussed, at step two of the sequential evaluation process the ALJ found Beckwith had the severe impairments of spine disorders, essential hypertension, depressive disorder, bipolar disorder, anxiety disorder, and post repair fracture of bones.   (Tr. 18).   Beckwith argues the ALJ should also have considered her migraines as a severe impairment.

Step two of the sequential evaluation process, during which the ALJ considers the medical severity of a claimant's impairments, constitutes a "'threshold inquiry' and 'allows only claims based on the most trivial impairments to be rejected.'" *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1264-65 (11ᵗʰ Cir. 2019) (citing *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11ᵗʰ Cir. 2004); *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11ᵗʰ Cir. 1986)).

An impairment or combination of impairments manifests as "non-severe" if it "does not significantly limit [the claimant's] physical or mental ability to do basic work activities."   20 C.F.R. §§ 404.1522(a), 416.922(a).   The term "basic work activities" refers to "the abilities and aptitudes necessary to do most jobs," including:

(1)    Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

8

(2)     Capacities for seeing, hearing, and speaking;

(3)     Understanding, carrying out, and remembering simple instructions;

(4)     Use of judgment;

(5)     Responding appropriately to supervision, co-workers and usual work situations; and

(6)     Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1522(b), 416.922(b).   Thus, an ALJ should characterize an impairment as non-severe "only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  *Schink,* 935 F.3d at 1265 (citing *McDaniel*, 800 F.2d at 1031).

Even so, the Eleventh Circuit maintains that an ALJ's failure to find a severe impairment at stage two "could be harmless if the ALJ nevertheless proceeded in the sequential evaluation, duly considered [the claimant's] mental impairment when assessing his RFC, and reached conclusions about [the claimant's] mental capabilities supported by substantial evidence."  *Schink*, 935 F.3d at 1268.   The erroneous finding of non-severity constitutes reversible error only when the ALJ limits the RFC assessment to the effects of the impairments he characterized as "severe," and omits discussion of the non-severe impairments.   As the Eleventh Circuit has stated,

consideration of all impairments, severe and non-severe, is required when assessing a claimant's RFC. *Bowen v. Heckler*, 748 F.2d 629, 634-35 (11th Cir. 1984). The ALJ must also consider a claimant's medical condition taken as a whole. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014); *Phillips*, 357 F.3d at 1237 (ALJ has a duty to consider impairments in combination and to determine whether combined impairments render the claimant disabled); *see also* 20 C.F.R. § 404.1523(c) and Social Security Ruling 96-8p.   If an ALJ fails to address the degree of impairment caused by the combination of physical and mental medical problems, the decision that the claimant is not disabled cannot be upheld. *Bowen*, 748 F.2d at 634 ("[I]t is certain that mental and psychological defects can combine with physical impairments to create total disability to perform gainful employment." (quoting *Brenem v. Harris,* 621 F.2d 688, 690 (5th Cir. 1980))).

*Schink*, 935 F.3d at 1268-69 (alteration in original).

Despite finding at step two that Beckwith's migraines did not present "more than slight abnormalities and have more than a minimal effect on [Beckwith's] ability to do basic physical or mental work activities" (Tr. 18), the ALJ proceeded to discuss the effects of the migraines when evaluating Beckwith's residual functional capacity at step four.   The ALJ considered Beckwith's handwritten migraine "'log' book . . . containing 'x' marks of complaints, duration, and treatment, side effects, on dates of the months from July through October 2019 . . . .   (Tr. 30).   However, he considered the log book "neither persuasive nor probative," as Beckwith created the document that served her interests, and the ALJ could not verify her notations "with any reasonable degree of certainty."   (Tr. 30-31).   The ALJ also stated:

10

The claimant testified that she needs to lie down daily from migraines and stay in bed [at] least 2-3 days.  She said she takes naps during the day; she lives upstairs because there are steps to downstairs. She wears a mask when going out wears Germ-X. [*sic*] Claimant's attorney argued "per log" for support noting that on August 3, she placed an "x" mark that she had migraine and so on.   However, the record is inconsistent with any complaints of severe migraines or any extensive medical treatment.  When seen by Dr. Patel on August 22, 2019, just nineteen days after August 3, she told him that she had "ear discomfort[,]" neck tenderness[,] and "bumps" in her mouth that improved with mouthwash.  She said, "No hospitalizations in a couple of years," no UTI symptoms today, and she frequently uses amoxicillin with increased temperature.  Her physical Examination noted the claimant as alert and oriented and in no acute distress and her physical examination was entirely normal. . . .   When seen at UAB in May 2019, where she complained of cognitive problems, she was noted as alert and oriented in no acute distress, and a normal physical examination with no swelling.  A CT of her head was "normal" . . . .   There [is] no objective documentation of the claimant wearing a mask for any treatment,[2] nor a need to lie down, nor any confirmation for the self-generated form.

(Tr. 31).

The ALJ adequately considered Beckwith's migraine headaches at step four despite failing to list the condition as a severe impairment at step two.  Accordingly, the ALJ did not err at step two of the sequential evaluation process.  Even if he did err, the error was harmless, and his failure to characterize Beckwith's migraines as a severe impairment does not provide a basis for overturning the administrative decision.

_____

[2] The court notes the ALJ rendered this statement prior to the throes of the global COVID-19 pandemic.

Beckwith may also argue the ALJ improperly evaluated her migraines under Social Security Ruling 19-4p, which provides guidance on evaluating cases involving primary headache disorders.[3]   SSR 19-4p states that the Social Security Administration "establish[es] a primary headache disorder as [a medically determinable impairment] by considering objective medical evidence (signs, laboratory findings, or both) from an [acceptable medical source]."   SSR 19-4p, 2019 WL 4169635, at *5.   The Administration will not rely solely upon a diagnosis or a claimant's statement of symptoms to establish the existence of a medically determinable impairment.   Rather, it will consider a combination of medical findings, including: a diagnosis of primary headache disorder supported by treatment notes and made after physical examination and exclusion of other potential headache causes; a physician's observation of a typical headache event; remarkable or unremarkable findings on laboratory tests; and the claimant's response to medications and other treatments.   *Id.* at *6.

The Social Security Administration also will consider a medically determinable impairment of primary headache disorder in assessing a claimant's residual functional capacity.   As with any other impairment, the Administration will evaluate whether the

---

[3] Beckwith's brief does not clearly portray whether she asserts such an argument.   Even so, for the sake of completeness, the court will address it.

record evidence is consistent with the claimant's impairment-related symptoms, such as an inability to sustain attention and concentration due to photophobia.   *Id.* at *7-8.

The Ruling advises that a claimant's "'headache journal' may aid a physician in diagnosing a headache disorder after reviewing a person's full medical and headache history."   *Id.* at *6 n.22.   Though the Social Security Administration does not require evidence from such a journal, it will consider such evidence "when it is part of the record, either as part of the treatment notes or as separate evidence, along with all evidence in the record."   *Id.* at *6 n.22.

Beckwith complains that the ALJ did not fully credit her headache journal, which documented the need to take medication for migraines lasting 3-24 hours on 19 of the 97 days between July 1 and October 30, 2019.   (Tr. 419-22).   As Beckwith points out, such a frequency, if credited, would bear significance in light of the vocational expert's testimony that absenteeism in excess of one day each month would preclude gainful employment.   (Tr. 108-09).   However, the ALJ properly considered the journal under the guidance of SSR 19-4p, "along with all evidence in the record." SSR 19-4p, 2019 WL 4169635, at *6 n.22.

Though Dr. Corliss, Beckwith's primary care provider, diagnosed her with chronic migraines as early as January 24, 2017, and treated her with medication (Tr. 1211-13), his records do not indicate he reached that diagnosis after physical

13

examination and exclusion of other potential headache causes, as SSR 19-4p specifies. Moreover, as with any other impairment, the mere fact that Beckwith received a diagnosis of migraine disorder does not render her disabled, as symptoms alone do not determine a claimant's ability to perform work-related activities. *Moore,* 405 F.3d at 1213 n.6 (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)); *see also Bros. v. Saul*, No. CV 1:20-00042-N, 2021 WL 1186136, at *8 (S.D. Ala. Mar. 29, 2021) (mere fact that a physician treated claimant for migraines was not dispositive of the existence of a disabling impairment).

When evaluating the limiting effects of Beckwith's migraine disorder, the ALJ permissibly considered that the medical record did not support the existence of disabling limitations, and substantial evidence supports the ALJ's finding.  The court could locate no mention of Beckwith's headache journal in her medical records, or any other corroboration of Beckwith's self-generated reports.  On October 2, 2018, just over a month prior to her amended alleged onset date, Beckwith reported good overall health and no headaches to Dr. Corliss.  She stated medication effectively controlled her migraines, and she believed she could return to full-time work.  (Tr. 1231). Indeed, Dr. Corliss signed a note on October 2, 2018, stating that Beckwith could return to work immediately.  (Tr. 1292).  Beckwith did mention migraines during her May 9, 2019, visit to Dr. Turner, but both the clinical examination and a CT scan produced

14

normal results.   (Tr. 1640-46).   On May 23, 2019, she complained to Dr. Corliss of a headache that did not respond to medication as well as in the past, so Dr. Corliss adjusted her medication.   (Tr. 1598-1600).   Beckwith did not complain of migraines during her August 22, 2019, visit to Dr. Patel.   (Tr. 1660-62).   Moreover, as SSR 19-4p states, migraine symptoms can cause problems with attention and concentration, yet, as the ALJ recognized, clinical examinations consistently reflect Beckwith displayed full alertness and orientation.   (Tr. 1230, 1233, 1598-99, 1600-02, 1661).   Finally, the ALJ correctly noted Beckwith did not seek any emergency treatment for migraines.

Thus, although Beckwith's headache journal and self-reported symptoms constitute some evidence of the severity of her migraine disorder, substantial evidence supported the ALJ's conclusion that the medical record did not support the existence of disabling limitations resulting from that condition.   The ALJ properly considered Beckwith's migraine disorder pursuant to SSR 19-4p.

## II.   The ALJ Properly Considered The Consultative Psychological Opinion of Jack Bentley, Ph.D, But The ALJ Did Not Properly Consider the Consultative Medical Opinion of Dr. John Thomas Nelson

The Social Security Administration revised its regulations regarding the consideration of medical evidence for all claims filed after March 27, 2017.   *See* 82 FR 5844-01, 2017 WL 168819 (Jan. 18, 2017).   Because Beckwith filed her claim for benefits after March 27, 2017, 20 C.F.R. §§ 404.1520c and 416.920c, the revised

regulations, govern.

Under those provisions, an ALJ must apply the same factors in considering all medical opinions and administrative medical findings, rather than affording specific evidentiary weight to any particular provider's opinion.  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Supportability and consistency constitute the most important factors in any evaluation, and the ALJ must explain the consideration of those factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  Thus, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s)," and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claims the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.1520c(c)(1)-(2).

The ALJ also may consider the medical source's specialty and the relationship between the claimant and the medical source, including the length, purpose, and extent of the treatment relationship, and the frequency of examinations.  20 C.F.R. §§ 404.1520c(c)(3)(i)-(iv), 416.920c(c)(3)(i)-(iv).  The ALJ "may" conclude that an examining medical source will understand the claimant's impairments better than a medical source who only reviews evidence in the claimant's file.  20 C.F.R. §§

16

404.1520c(c)(3)(v), 416.920c(c)(3)(v).  The ALJ also "will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding," including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."   20 C.F.R.  §§  404.1520c(c)(5), 416.920c(c)(5).

### A.   The ALJ Properly Considered the Opinion of Consultative Psychological Examiner Jack Bentley, Ph.D

Dr. Jack Bentley, Ph.D., conducted a consultative psychological examination on February 21, 2019.  Dr. Bentley summarized Beckwith's physical problems, including cervical fracture, orthopedic injuries, collapsed lungs and splenectomy from a 2009 car accident; compromised immune system; cardiomyopathy, migraine headaches; gait limitations due to spinal misalignment; and degenerative joint disease.  Beckwith described herself as moderately to severely depressed due to her chronic pain, loss of lifestyle, and inability to work.   She reported crying spells, mood swings, irritability, and occasional rages.   Her primary medical doctor treated those symptoms with medication.   Beckwith also described mild to moderate anxiety, but her anxiety had increased due to her health problems.   Beckwith had never been hospitalized for psychiatric reasons, and she never pursued formal psychiatric treatment.   She had no

history of suicidal ideation, hallucinations, or paranoia.

During the clinical evaluation, Beckwith displayed pain-related behaviors, and Dr. Bentley summarized her psychological symptoms thusly:

> There were no limitations in her receptive or expressive communication skills. Her tertiary and immediate memories were intact. The patient made fair eye contact. She provided relevant responses to all questions. Her mood was moderately dysphoric and congruent with her affect. There was evidence of some memory loss associated with her pain disorder and inability to sustain her concentration. She exhibited some anxiety and restlessness associated with her pain disorder secondary to the obvious discomfort she was experiencing during the interview. The client did not exhibit any unusual or peculiar behaviors.
>
> The patient was alert and oriented. She failed to recall any of three objects after a five-minute delay. The claimant did recite five digits forward and three backwards. The client indicated that there are 52 weeks in a year, the sun rises in the east and Shakespeare's the author of Hamlet. She interpreted two Proverbs and provided the analogy in three of three abstractions. The patient accurately performed serial 7's and 3's from 100. She spelled the word "world" forward and backwards. The client correctly identified national and state leaders. She was able to count backwards from 20 to 1.

(Tr. 1584-85).

Dr. Bentley found "evidence of a moderate to severe sleep disturbance," as Beckwith suffered initial and middle night insomnia and experienced difficulty relaxing due to her pain, neuropathy, and racing thoughts. Beckwith reported attending church occasionally, but she denied having any friends, and she had discontinued many aspects of her day-to-day lifestyle due to her pain. Thus, most of her social interaction came

18

from immediate family.   However, Beckwith could complete her activities of daily living without assistance.

Dr. Bentley assessed depressive disorder with anxiety due to medical reasons, moderate, recurrent; multiple health problems; and cognitive disorder secondary to a traumatic brain injury.   He characterized Beckwith's condition as "reasonably stable on a regimen of Lexapro and Ativan," and he observed Beckwith had not pursued mental health services.   He did not detect symptom exaggeration, and he opined Beckwith could manage any funds Social Security awarded.   He characterized the prognosis for her current level of functioning as "favorable." (Tr. 1585).

Based upon his evaluation, Dr. Bentley assessed marked limitation in Beckwith's ability to complete complex or repetitive work-related activities and moderate limitation in her ability to perform simple tasks.   He assessed "similar limitations" for Beckwith's ability to communicate effectively with coworkers and supervisors.   He opined:

> Most of her work related restrictions would stem from her pain disorder and other health problems as previously described.   These restrictions and limitations would need to be addressed by an appropriately trained physician.   It would appear extremely difficult for this individual to sustain even simple work related tasks based on the pain behavior she exhibited during this interview.

(Tr. 1586).

The ALJ found Dr. Bentley's assessment "not persuasive and inconsistent with

19

the other evidence as noted throughout this decision." (Tr. 30).  As an explanation

for that conclusion, the ALJ reasoned:

> Dr. Bentley notes in the record of evidence of a moderate to severe sleep disturbance, however, he is not a medical doctor to be competent to make such assessment, and it is not supported by the objective medical evidence.   This is based exclusively on the claimant's subjective statements that she has middle night insomnia, trouble relaxing at night. There is no such objective documentation to support this statement.   The claimant reported she has discontinued many aspects of her day-to-day lifestyle.   However, he noted that the claimant without assistance completes her activities of daily living.  The claimant's social life was found to be limited to her immediate family. . . .   Dr. Bentley then states that most of the claimant's work related restrictions would stem from her pain disorder that would need to be addressed by the appropriate physician . . . .

(Tr. 30).

> The ALJ also considered that

> Dr. Bentley examined the claimant one time and had not established a treating relationship with the claimant.   Further, based upon the opinion in part, the claimant's physical limitations were considered but he is a psychologist, and any opinion by him regarding the claimant's physical limitations is well outside of his field of expertise.  "She's not been hospitalized for psychiatric reasons.   The client has never pursued formal psychiatric treatment.   There's been no history of suicidal ideation, hallucinations or paranoia."   The undersigned finds that the medical evidence of record does not show that the claimant has any more than moderate limitations resulting from her mental impairments as referenced.

(*Id.*).   In particular, the ALJ considered that Beckwith

> was treated at the Internal Medicine and Pediatrics of Cullman on February 11, 2019, ten days prior to the consultative examination with Dr.

Bentley, with a "Chief Complaint," ear and lymph node pain on left side, yeast infection, back pain and back popping up back to neck. She complained of chronic neck pain and stiffness, but this sensation is new. She was noted as alert and oriented x 4 with no confusion. Specifically, there is no mention from the claimant's treating source of moderate to severe sleep disturbance, and suffering initial and middle night insomnia. On May 23, 2019, she was seen for a recheck and "accompanied by no one." She said she had <u>no</u> recurrent fevers, and was alert and oriented x 4 with no confusion. She was in no acute distress, her neck was noted as supple, lungs were clear, respiration were [*sic*] non-labored. Her heart showed a normal rate, regular rhythm, no murmur, no gallop, with normal peripheral perfusion and no edema. She was examined and found with no tenderness, no swelling, no deformity, and neurologically, she was observed as alert, oriented, and no facial deficits. . . .

(*Id.*) (emphasis in original).

The court finds the ALJ appropriately considered Dr. Bentley's opinion in accordance with the revised regulations, and substantial evidence supported the ALJ's decision. Beckwith's arguments to the contrary do not persuade the court.

First, Beckwith asserts the ALJ improperly considered findings that she appeared alert and oriented during treatment visits for isolated physical problems. The court agrees that passing notations of the lack of psychological or neurological symptoms during an examination for a specific condition do not warrant the highest level of evidentiary weight, as the examiner likely did not focus upon the patient's emotional state when making the notations. *See, e.g., Cash v. Comm'r of Soc. Sec.*, No. 4:19-CV-01789-JHE, 2021 WL 1117754, at *7 (N.D. Ala. Mar. 24, 2021). However, there exists

21

no authority holding an ALJ must entirely avoid considering such notations, and here, the ALJ did not rely solely upon the notations to reject Dr. Bentley's assessment.   As discussed, he also considered Dr. Bentley's specialization, Beckwith's daily activities, the lack of medical records describing mental health symptoms, and Beckwith's failure to seek specialized mental health treatment.

Second, Beckwith argues the ALJ impermissibly considered Dr. Bentley's specialty as a psychologist when assessing Dr. Bentley's comments about Beckwith's physical symptoms.  This argument cannot succeed because the revised regulations specifically state an assessor should consider a physician's specialty when determining the amount of weight to assign that physician's opinions.   20 C.F.R. §§ 404.1520c(c)(4), 416.920c(c)(4) ("The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.").

Third, Beckwith argues the ALJ impermissibly considered Dr. Bentley's status as a one-time examiner.   Again, this argument cannot succeed because the revised regulations specifically state an assessor should consider the nature and length of the relationship between the claimant and the medical source when determining the amount

22

of weight to assign that source's opinions.   20 C.F.R.   §§ 404.1520c(c)(3)(i)-(v),
416.920c(c)(3)(i)-(v).

Fourth, Beckwith argues the ALJ erred by rejecting Dr. Bentley's assessment, as
Dr. Bentley constituted "the only mental health professional to treat or examine Ms.
Beckwith."   (Doc. 15, at 28).   Beckwith relies upon *Carril v. Barnhart*, 201 F. Supp. 2d
1190 (N.D. Ala. 2002), where the ALJ rejected a psychologist's consultative report that
constituted "the only evidence provided by a mental health professional relating to the
impairment and/or its resulting limitations — and found that Plaintiff did not suffer a
mental impairment and that he did not have any restriction due to depression."   *Id.* at
1191.   The court found the ALJ erred because "rejection of the only medical evidence
of a mental health impairment is not substantial evidence to support the Administrative
Law Judge's finding that Plaintiff did not suffer a mental impairment."   *Id.*

As an initial matter, the *Carrill* decision was based upon the Seventh Circuit's
decision in *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995), which the Eleventh Circuit
has repeatedly declined to follow.   *See Hand v. Social Security Administration,* 786 F. App'x
220, 226 (11th Cir. 2020); *Jackson v. Social Security Administration, Comm'r,* 779 F. App'x.
681, 685 (11th Cir. 2019); *Arnold v. Social Security Administration,* 724 F. App'x. 772, 79
(11th Cir, 2018).   Moreover, even if *Carrill* did represent Eleventh Circuit law, the
decision does not require an ALJ to fully credit a consultative examiner's opinion any

23

time the record lacks another examiner's opinion.   To the contrary, the revised regulations state an assessor may reject any physician's opinion when the record does not support it.   Moreover, *Carrill* is distinguishable because the ALJ in this case found that Beckwith suffered a mental impairment, and the record contains another medical assessment of Beckwith's psychological condition – that of state agency psychologist Robert Bare, Ph.D.   (Tr. 160-62).

Fifth, Beckwith argues the ALJ erred by rejecting Dr. Bentley's comments about her moderate to severe sleep disturbance as within the province of a medical doctor, rather than a psychologist.   The court agrees that a sleep disturbance could cause or result from psychological symptoms, not just physical symptoms.   Even so, the ALJ appropriately considered that Dr. Bentley based his assessment of a sleep disorder primarily upon Beckwith's subjective complaints, not upon any medical evidence.

In her reply brief, Beckwith argues that the ALJ inaccurately characterized Dr. Bentley's opinion as follows:   "The claimant reported she has discontinued many aspects of her day-to-day lifestyle.   However, [Dr. Bentley] noted that the claimant without assistance completes her activities of daily living."   (Doc. 17, at 8 (quoting Tr. 30)).   As Beckwith asserts, Dr. Bentley actually stated:   "Due to the obvious pain being experienced by this individual, she has discontinued many aspects of her day-to-day lifestyle.   She completes her ADL's without assistance."   (Doc. 17, at 8 (quoting Tr.

24

1585)).   The court can discern no meaningful distinction between the two statements, and therefore it finds no error in the ALJ's decision.

In summary, the ALJ properly considered the opinion of consultative psychological examiner Dr. Bentley.

**B.     The ALJ Failed to Properly Consider the Results from Beckwith's March 21, 2019, X-Rays When Evaluating the Report of Medical Consultative Examiner Dr. John Thomas Nelson**

Dr. Nelson conducted a consultative medical examination on February 16, 2019. During the consultation, Beckwith complained of:   (1) constant neck pain since a 2009 motor vehicle accident at a level six out of ten that worsens with activity and weather changes, occasionally radiates into her thoracic spine, and limits her ability to hold up and move her head; (2) constant, achy, non-radiating, bilateral low back pain at an average level of six out of ten, which improves with prescription medications and rest, increases with activity, and limits her abilities to bend, stoop, and lift; (3) a trauma with fractures, splenectomy, and subdural hematoma from the 2009 motor vehicle accident; (4) cardiomyopathy and heart failure beginning in 2018, and resulting in limitations of walking a few hundred feet at a time and standing two to three hours a day; (5) cholecystectomy (gall bladder removal) in 2012 with no other biliary issues since the surgery; (6) myopathy, weakness, and muscle spasm beginning in 2016, and resulting in difficulty arising from chairs, but helped by physical therapy; (7) short term memory

25

loss since the 2009 motor vehicle accident; (8) depression and anxiety since the 2009 motor vehicle accident, which she has intermittently treated with medication; (9) arthritis in the hips, neck, and back secondary to trauma; and (10) a compromised immune system since the 2009 splenectomy, resulting in frequent infections. (Tr. 1575-76).

Beckwith reported "[s]he was terminated following extended leave after the last bought [*sic*] of sepsis in 2018. Last worked in 2017 as an IT technologist before she was dismissed following prolonged leave after battling sepsis in 2018." (Tr. 1576). She declared she did not use an assistive device to ambulate. She could walk very short distances on level ground, and she could feed and dress herself. She experienced difficulty standing for five to fifteen minutes and lifting more than five pounds with each arm. She could not drive, sweep, mop, vacuum, cook, do dishes, shop for groceries, care for the yard, mow the grass, or balance a checkbook. She could climb no more than two or three steps, and she experienced difficulty turning a doorknob with both hands. She could write her own name. (Tr. 1577).

During the physical examination, Beckwith could arise up and out of a chair with mild difficulty, and she could sit on and arise from the examination table with difficulty. She ambulated with difficulty, but without an assistive device. She displayed abnormal, antalgic gait. The cardiovascular examination revealed tachycardic pulse; no edema,

ulcerations, or varicosities; regular rhythm; no gallop or abnormal heart murmur; and no displaced PMI (point of maximal impulse).   From the spine and extremities examination, Dr. Nelson detected

> no evidence of scoliosis.   There was no spasm of the paraspinous muscles noted.   There was no evidence of kyphosis.   Feet with intact sensation and no focal lesion.   Sitting straight leg raising:   left leg was 60 degrees and was negative without pain.   Right leg was 60 degrees and was negative without pain.   Supine straight leg raising:   left leg was 50 degrees and straight leg raising was positive radiating down left leg.   Right leg was 50 degrees and was positive radiating down right leg.   The claimant was not able to walk on the toes.   The claimant was not able to walk on the heels. The claimant could squat on the floor and recover.   The claimant can perform tandem heel walking.   The claimant had difficulty bending over and touching [her] toes.

(Tr. 1579).

Beckwith displayed 4/5 grip strength in the right hand, indicating active movement against moderate resistance.   She displayed 4/5 grip strength in the left hand, indicating active movement against slight resistance.   She displayed full fine and gross manipulation ability in both hands.   (Tr. 1579-80).   She exhibited normal mentation, 4/5 motor strength, intact sensation, no cerebellar abnormalities, intact cranial nerves, and intact reflexes.   She exhibited limited cervical and lumbar range of motion, but normal range of motion in other joints.   Psychiatrically, she presented as euthymic, without suicidal ideation.   (Tr. 1580).

Dr. Nelson described Beckwith as a "28 year-old right-handed woman with

27

allegations of limitation related to neck and back pain, post traumatic arthritis, cardiomyopathy, myopathy, mental illness, and compromised immune system post-splenectomy." (*Id.*). He opined that Beckwith could stand, sit, walk, bend, stoop, lift, and carry occasionally (very little up to 1/3 total of an 8-hour work day). Her radicular low back pain and reduced cervical range of motion would limit her more than any other impairments, but her frequent infections post-splenectomy would further limit "her ability to reliably maintain a job." (Tr. 1581). Due to her reduced grip strength, she could grasp and handle objects frequently (1/3 to 2/3 total of an 8-hour work day) to continuously (more than 2/3 of an 8-hour work day). Dr. Nelson discerned "no objective evidence of limitation with regards to the claimant's ability to see, hear, reach, or with understanding or memory." (*Id.*). He observed Beckwith experienced difficulty ambulating, but she did not require an assistive device. (*Id.*).

The vocational expert testified that a person of Beckwith's age, education, and past relevant work experience, but who could lift no more than five pounds and sit, stand, and walk occasionally (defined as *up to* one-third of an eight-hour day), could not perform any jobs in the national economy, as the abilities to sit, stand, and walk would not necessarily add up to a full eight-hour work day. (Tr. 109). Thus, if the ALJ credited Dr. Nelson's limitations on sitting, standing, and walking, he would have found Beckwith disabled.

However, the ALJ found Dr. Nelson's opinions "probative, but not entirely persuasive." (Tr. 28). He reasoned:

> Firstly, this opinion is not consistent with the treatment records that does not show [*sic*] a series of infections during the relevant period. There was no clear evidence of infection in August 2019 and the current UTI (urinary tract infection) was mostly likely viral . . . . It appears [Dr. Nelson's] limitations are based upon the claimant's complaints and exhibiting limitations in walking. Her treating physicians do not note such exhibition of limitations. There are no imagining [*sic*] studies noted by Dr. Nelson for any confirmation of the claimant's complaints. Moreover, Dr. Nelson was a one-time consultative examiner and his own examination is inconsistent with the medical records from the claimant's treating physician as noted throughout this decision. Exhibiting a loss or restrictive range of motion is a subjective finding that is one that is under the control of a person to report/display or not report/display irrespective of actual symptoms. An individual's symptoms are considered along with pertinent signs and laboratory findings shown in the record. Specifically a person's statements alone are not enough to establish disability. A finding of disability will not be based on symptoms. There must be medical signs or laboratory findings showing the presence of a medical condition that could be reasonably expected to produce the symptoms alleged.

(*Id.*).

Beckwith challenges the ALJ's finding that "[t]here are no [imaging] studies noted by Dr. Nelson for any confirmation of the claimant's complaints." (Tr. 28). The ALJ's statement technically is correct: Dr. Nelson did not conduct any diagnostic imaging, and he did not mention any objective diagnostic imaging results.

29

Even so, the record contains x-ray results dated March 21, 2019, *after* Dr. Nelson's examination and report.   The x-ray report stated:

(1) T11 compression fx[ fracture], chronic
(2) T12 with ? central superior endplate compression fx, chronic
(3) L-spine w/o f/x or DDD
(4) L5 vert. body with probable hypoplasia [?] is old chronic compression fx; that contributes to asymmetric [increased?] of L4-L5 disc space anteriorly.

(Tr. 1588).   Beckwith argues both that the ALJ did not mention the March 21, 2019, x-ray report, and that the ALJ failed to properly develop the record because the "x-ray report is inadequate and unreadable."   (Doc. 17, at 5).

The ALJ retains a basic duty to develop a full and fair record. *Pennington v. Comm'r of Soc. Sec.*, 652 F. App'x 862, 871 (11th Cir. 2016).   In determining whether to remand a case for further development of the record, a court considers "'whether the record reveals evidentiary gaps which result in unfairness or clear prejudice.'"   *Vangile v. Comm'r, Soc. Sec. Admin.*, 695 F. App'x 510, 512 (11th Cir. 2017) (quoting *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995) (per curiam)).   As the March 21, 2019, x-ray report contains three unreadable terms, it could present a troubling evidentiary gap.

However, even without considering the unreadable terms, the x-ray report presents objective evidence of severe spinal injuries that could reasonably produce significant functional limitations.   Even though the ALJ conducted an extensive review

30

of the evidence, he did not discuss the March 21, 2019, x-ray report.   As the ALJ based his criticism of Dr. Nelson's report largely on the lack of supporting objective evidence in the record, the ALJ's failure to discuss the x-ray report bears significance.   The court cannot conclude that the ALJ's decision enjoyed substantial evidentiary support absent any consideration of the x-ray report.

Accordingly, the court will remand the case for further consideration of Dr. Nelson's consultative report in light of Beckwith's March 21, 2019, x-ray results.

## CONCLUSION

For the foregoing reasons, the court **REVERSES** the Commissioner's decision and **REMANDS** the case for further consideration of Dr. Nelson's consultative report in light of Beckwith's March 21, 2019, x-ray results.   The court will enter a separate Final Judgment.

**DONE** this 23rd day of March, 2022.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE